IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 5, 2013

IN RE MICHAELA V. ET AL.

Appeal from the Circuit Court for Sullivan County
No. C38987     E.G. Moody, Judge

No. E2013-00500-COA-R3-PT-FILED-NOVEMBER 19, 2013

This is a termination of parental rights case focusing on Michaela V.; Michael V., Jr.; and Tyler V., the minor children ("Children") of Michael V., Sr. ("Father"). The Children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on August 22, 2008. On January 5, 2011, DCS filed a petition to terminate Father's parental rights. Following a bench trial held on October 12, 2011, the trial court granted the petition upon its finding, by clear and convincing evidence, that Father had abandoned the Children by willfully failing to provide financial support during the four months preceding the filing of the petition. The court further found, by clear and convincing evidence, that termination of Father's parental rights was in the Children's best interest. Father has appealed. We affirm.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Kenneth E. Hill, Kingsport, Tennessee, for the appellant, Michael V., Sr.

Robert E. Cooper, Jr., Attorney General and Reporter, and Derek C. Jumper, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Factual and Procedural Background

The Sullivan County Juvenile Court entered a protective custody order on behalf of the Children on August 25, 2008, removing them from the home of their mother, Sonya W. ("Mother") and placing them in DCS custody.[1] At that time, Michaela was eleven years old, Michael was ten years old, and Tyler was eight years old. The Children were removed from Mother's home due to allegations of abuse and neglect. Prior to moving to Tennessee, Mother and the Children had lived in Texas with Father, where Father was still living when the Children were taken into protective custody. A fourth sibling of the Children, Tanner, who was five years old at the time of trial, remained in Texas in the legal custody of the paternal grandparents ("Grandparents") and is not included in this action.

On October 22, 2008, the Juvenile Court adjudicated the Children dependent and neglected as to Mother and entered a no-contact protective order against Father due to allegations that Father had sexually abused Michaela when the Children lived in Texas. DCS caseworker Kim Steadman testified that she attempted to contact Father in Texas several times through the Grandparents but was unable to reach Father until he telephoned DCS on July 13, 2009. Upon learning that Father wished to participate in the case at bar, Ms. Steadman requested a home study in Texas through an Interstate Compact on the Placement of Children ("ICPC") for possible residential placement of the Children with Father. Texas Children's Protective Services ("CPS") denied the ICPC request for Father's home study because he faced a pending criminal charge in Texas for sexual abuse and because he had a history of CPS involvement for physical abuse and neglect.

Ms. Steadman requested a home study for possible placement of the Children with the Grandparents as well. Texas CPS denied the ICPC request for the Grandparents' home study because the Grandparents lived in close proximity to Father. The Grandparents were allowed telephone calls with the Children for a short time, but DCS discontinued the communications after Grandmother admitted allowing Father to listen to the Children during one such telephone call.

Father participated telephonically in a child and family team meeting on August 19, 2009, at which a permanency plan was created that was ratified by the Juvenile Court on November 18, 2009. The plan required Father to contact Child Support Enforcement, financially support the Children, and provide needed items for the Children while they were

---

[1]Mother voluntarily surrendered her parental rights to the Children on April 7, 2010, and is not a party to this action.

in state care. It is undisputed that Father failed to pay any child support or provide any needed items for the Children while the Children were in protective custody.

DCS filed a petition to terminate the parental rights of Father as to the Children on January 5, 2011. A bench trial was held on October 12, 2011, at which Father failed to appear, but the Grandparents testified as intervening petitioners requesting custody of the Children. The trial court found by clear and convincing evidence that Father had abandoned the Children by willfully failing to support them and that it was in the best interest of the Children to terminate Father's parental rights. The trial court entered its final decree on January 16, 2013. Father timely appealed.

## II. Issues Presented

On appeal, Father presents two issues, which we have restated as follows:

1. Whether the trial court properly exercised subject matter jurisdiction in addressing the State's petition to terminate Father's parental rights.

2. Whether the trial court erred by finding that there was clear and convincing evidence of the statutory ground of abandonment by willful failure to support for termination of Father's parental rights.

In addition, the State raises the following issue essential to our review:

3. Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Subject Matter Jurisdiction

Father contends that the trial court lacked subject matter jurisdiction to address the State's petition to terminate parental rights because a previously filed petition for termination of Father's parental rights was still pending in the Juvenile Court at the time of trial. Following a thorough review of the record, we conclude that the Circuit Court properly exercised subject matter jurisdiction.

Subsequent to Mother's surrender of her parental rights, DCS filed a petition in the Juvenile Court on April 12, 2010, seeking termination of Father's parental rights to the Children. Following a hearing on May 26, 2010, at which Father failed to appear, the

Juvenile Court reset the hearing for August 9, 2010, entering an order to that effect on June 11, 2010. The record on appeal contains no subsequent orders issued by the Juvenile Court regarding the Children. The instant petition was filed by DCS in the Circuit Court ("trial court") on January 5, 2011.

Throughout the proceedings in the trial court, Father did not raise the issue of subject matter jurisdiction. This Court generally will not consider on appeal an issue not raised in the trial court. Tenn. R. App. P. 13(b); *see also Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000) ("As a general matter, appellate courts will decline to consider issues raised for the first time on appeal that were not raised and considered in the trial court.") We must, however, consider an issue of subject matter jurisdiction even when it was not previously raised by a party because jurisdiction is essential to a court's authority to act. *See* Tenn. R. App. P. 13(b) (noting that this Court shall consider subject matter jurisdiction even when not presented as an issue for review); *In the Matter of H.N.K.*, No. M2005-02577-COA-R3-PT, 2006 WL 1641359 at *3 (Tenn. Ct. App. June 13, 2006) ("'It is the duty of any court to determine the question of its jurisdiction on its own motion if the issue is not raised by either of the parties, inasmuch as any judgment rendered without jurisdiction is a nullity.'") (quoting *Scales v. Winston*, 760 S.W.2d 952, 953 (Tenn. Ct. App. 1988)). Whether a court possesses subject matter jurisdiction over an action is a matter of law, which we review *de novo* with no presumption of correctness. *See In re Bernard T.*, 319 S.W.3d at 597; *In re D.Y.H.*, 226 S.W.3d 327, 329 (Tenn. 2007).

Pursuant to Tennessee Code Annotated § 37-1-104(c) (2010), juvenile courts have concurrent jurisdiction with circuit and chancery courts to terminate parental rights. Pursuant to Tennessee Code Annotated § 37-1-103(a)(1) (2010), however, juvenile courts have exclusive original jurisdiction to adjudicate children as dependent and neglected. *See In re D.Y.H.*, 226 S.W.3d at 330 (noting that the two primary statutes conferring jurisdiction on juvenile courts are Tenn. Code Ann. § 37-1-104, defining areas of concurrent jurisdiction, and Tenn. Code Ann. § 37-1-103, defining areas of exclusive original jurisdiction). Section 103 further provides that once a juvenile court has acquired jurisdiction over the custody of a child through a dependency and neglect proceeding, "such jurisdiction shall continue until the case has been dismissed, or until the custody determination is transferred to another juvenile, circuit, chancery or general sessions court exercising domestic relations jurisdiction, or until a petition for adoption is filed regarding the child in question as set out in § 36-1-116(f)." *Id.* at 103(c).[2]

---

[2]The Tennessee General Assembly amended Tennessee Code Annotated § 37-1-103(c), effective July 1, 2011, after the filing of the instant petition, without effect to the relevant passage. *See* 2011 Pub. Acts, ch. 485 §§ 1-2.

This Court has held previously that even when a dependency and neglect proceeding has been filed in a juvenile court, the circuit or chancery court retains concurrent jurisdiction to hear a petition for termination of parental rights. *See State Dep't of Human Res. v. Tate*, No. 01-A-01-9409-CV-00444, 1995 WL 138858 at *3 (Tenn. Ct. App. Mar. 31, 1995) ("Even though a dependency and neglect petition was previously filed in the juvenile court, Tennessee Code Annotated section 37-1-104(c) vests the circuit court with subject matter jurisdiction over proceedings to terminate parental rights."); *see also In the Matter of H.N.K.*, 2006 WL 1641359 at *11 n.8 ("'If the child has been found to be dependent and neglected in juvenile court and the termination action is filed somewhere other than juvenile court, the juvenile court retains jurisdiction over custody and visitation matters, and the termination court is limited to making a determination regarding termination of parental rights.'") (quoting DAWN COPPOCK, COPPOCK ON TENNESSEE ADOPTION LAW 29-30 (5th ed. Lexis 2005)).

In the case at bar, the Juvenile Court acquired subject matter jurisdiction over custody of the Children through the dependency and neglect proceedings. As noted above, those proceedings did not preclude the Circuit Court's concurrent jurisdiction to address a petition for termination of parental rights as to the Children. *See Tate*, 1995 WL 138858 at *3. Father argues, however, that in this case subject matter jurisdiction remained exclusively with the Juvenile Court because DCS initially filed in that court a petition for termination of Father's parental rights for which no order of dismissal or transfer to Circuit Court appears in the record. In support of his position, Father cites *In re B.N.S.*, in which this Court determined that in a venue conflict between two juvenile courts of different counties, the first juvenile court to acquire jurisdiction retained continuing jurisdiction. *See* No. M2003-02524-COA-R3-PT, 2004 WL 892535 at *3 (Tenn. Ct. App. Apr. 26, 2004) ("The clear policy behind Tenn. Code Ann. § 37-1-103(c) is that once a juvenile court assumes and exercises jurisdiction over a child, it should continue to exercise jurisdiction over that child until the case is concluded unless for good reason, it decides to transfer the case to another court."). The State is silent regarding this issue in its responsive brief.

The trial transcript contains the following testimony by Travis Sherfey, Ms. Steadman's successor as case manager for the Children, on direct examination:

State's Counsel:  Mr. Sherfey, are you aware of whether or not there was a probable cause finding in Juvenile Court with respect to [Father]?

-6-

| | |
|---|---|
| Mr. Sherfey: | Initially when we initially filed the TPR, we did so in Juvenile Court, and the [sic] Judge Toohey[3] ruled that we had not done probable – had a probable cause against [Father]. That was scheduled and heard on January of 2011, and at that hearing he found the children dependent neglected as well as relieved the Department of reasonable efforts. |
| State's Counsel: | So the Department's been relieved of reasonable efforts as of what date? |
| Mr. Sherfey: | January 7th of 2011. |

Later in his testimony, Mr. Sherfey stated the following on cross-examination:

| | |
|---|---|
| Father's Counsel: | You testified that when you filed the original Termination Petition that it was dismissed? |
| Mr. Sherfey: | Yes. |
| Father's Counsel: | Voluntarily by the Department. Correct? |
| Mr. Sherfey: | Judge Toohey stated that he could not hear it at this time because of – he could not find an Order that actually laid out that the father – the children were dependent neglected through the father. |
| Father's Counsel: | Correct. So there had never been a clear and convincing finding of dependency and neglect or substantial risk of harm as to the father? |
| Mr. Sherfey: | I know at previous hearings it had been discussed, but he was not named on the Petition and not in the Orders. |

Mr. Sherfey's testimony regarding the January 7, 2011 hearing in Juvenile Court was uncontested at trial; indeed, the questions from Father's trial counsel[4] emphasized that the petition for termination of Father's parental rights filed in Juvenile Court was voluntarily dismissed by the State. Mr. Sherfey's testimony also comports with the timing of the termination petition filed with the Circuit Court on January 5, 2011. The record on appeal contains only those pleadings, orders, and exhibits from the Juvenile Court that were entered as exhibits during the Circuit Court proceeding. Considering Mr. Sherfey's uncontested testimony, we must conclude that DCS voluntarily dismissed the petition for Father's

---

[3]Judge Mark H. Toohey presided over the Juvenile Court proceedings involving the Children.

[4]Father's trial court counsel was not the same as his appellate counsel.

parental rights filed in the Juvenile Court nearly contemporaneously with its filing the instant petition in the Circuit Court.

Father also argues that jurisdiction in the Circuit Court was not proper because the State failed to send notice of its filing the petition for termination of Father's parental rights to the Juvenile Court. In support of his argument, Father cites Tennessee Code Annotated § 36-1-113(d)(4) (2010), which states in relevant part:

> If the petition is filed in a court different from the court where there is a pending custody, dependency, neglect or abuse proceeding concerning a person whose parental rights are sought to be terminated in the petition, a notice of the filing of the petition, together with a copy of the petition, shall be sent by the petitioner to the court where the prior proceeding is pending.

Regarding whether written notice and a copy of the petition filed in Circuit Court were filed with the Juvenile Court, we must credit Father's assertion on appeal that they were not, as the State did not respond on this point. However, having determined that the petition for termination of Father's parental rights was no longer pending in the Juvenile Court upon the State's voluntary dismissal of the initial termination petition on January 7, 2011, we determine that a lack of further written notice to the Juvenile Court did not divest the Circuit Court of its concurrent jurisdiction. *See* Tenn. Code Ann. § 37-1-104(c) ("The juvenile, circuit and chancery courts have concurrent jurisdiction to terminate parental or guardian rights pursuant to the provisions of title 36, chapter 1; part 1."). We conclude that the Circuit Court properly exercised subject matter jurisdiction in terminating Father's parental rights to the Children.

## IV. Abandonment by Willful Failure to Support

The trial court terminated Father's parental rights on the statutory ground that he abandoned the Children by willfully failing to support them. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2012) provides, as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (2010) defines abandonment, in relevant part, as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

> Failure to visit or support a child is "willful" when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864.

> This Court further explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted). Further, as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides: "Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made."

In its final judgment, the trial court included the following specific findings regarding Father's willful failure to support the Children:

> The proof showed that [Father] has failed to make any type of support payments, monetary or otherwise, since the children have been in the custody of the state, although there was adequate proof [Father] was employed and capable of paying support.
>
> [Father] was involved in the creation of permanency plans for these children adopted as an order of the Juvenile Court on November 18th 2009, [Father] was required to contact Child Support Enforcement, financially support the children, and provide needed items for the children while in care.
>
> [Father] has not contacted Child Support Enforcement, not paid any support, nor provided any needed items for the children.
>
> [Father] knew or should have known that he had to pay child support because he participated in the creation of the permanency plan, received a copy of said plan, and DCS explained the requirement of support and the consequences of his failure to support the children to [Father].
>
> . . .
>
> [Father] is able-bodied and capable of working and earning enough to support himself as well as paying children support.
>
> [Father] was not in jail or incapacitated in the four months before this petition was filed, and he could have worked and supported the children.
>
> [Father] knew the consequences of his failure to support the children because DCS gave [Father] a copy of a permanency plan that contained an explanation of the consequences of his failure to support the children regularly.

(Paragraph numbering omitted.) The trial court found, by clear and convincing evidence, that Father had willfully failed to support the Children during the more than three years the Children had been in protective custody prior to trial, including the applicable four-month period preceding the filing of the petition for termination of parental rights. Upon our careful review of the record in this cause, we agree.

Father does not dispute the fact that he paid no child support and sent no supplies for the Children during the time period they were in protective custody, including the four determinative months preceding the filing of the present petition. Father contends instead that the trial court erred by finding clear and convincing evidence that his failure to support the Children was willful because (1) he was not ordered by a court to do so and (2) he was financially unable to provide support. Father participated telephonically in one child and family team meeting at which a permanency plan was developed on August 19, 2009. The permanency plan was ratified by order of the Juvenile Court on November 18, 2009. Under

-10-

the then-goal of "Return to Parent" contained in the permanency plan, among the "Actions Needed to Achieve Desired Outcome," was "[Father] will contact Child Support Enforcement at [number given] and will financially support the children if ordered to do so." Father argues that by reason of this language incorporated in the permanency plan and according to his knowledge, he was only required to pay child support if placed under a court order to do so.

Father failed to appear at trial, and his counsel was unable to present any evidence that Father had contacted Child Support Enforcement as directed on the August 19, 2009 permanency plan. We note that this plan also included a "desired outcome" for Father to "become financially responsible" for the Children and directed him to "provide any needed items for the children" pending a child support order. DCS case manager Kim Steadman testified that she reviewed the August 19, 2009 plan with Father, including the requirement that he support the Children. She explained to Father "word for word" the possibility of his parental rights being terminated. Father also asserts that he could not have known he was required to pay support because subsequent parenting plans failed to include the action step that he do so. The record shows that Father failed to participate in child and family team meetings held regularly subsequent to August 2009 despite receiving notice by mail of the meetings. In addition, Ms. Steadman and Mr. Sherfey both testified that Father never contacted them to inquire regarding the Children's needs and what items he might send the Children. We note that Father was under a no-contact order that prevented him from visiting the Children or sending them letters or greeting cards. As Mr. Sherfey stated at trial, Father's method of sending needed items to the Children would have been via DCS personnel.

We determine that Father had been informed by DCS that he was required to pay child support and provide needed items for his Children. He was also under court order, through the Juvenile Court's ratification of the August 19, 2009 permanency plan, to contact Child Support Enforcement and, pending a resulting child support order, provide needed items for the Children. In addition, as the trial court noted, Father, who was thirty-five years old at the time of trial, is presumed to have known he was under a legal obligation to support his children. *See* Tenn. Code Ann. § 36-1-102(1)(H) (2010) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children.").

Father relies on *In re J.J.C., D.M.C., & S.J.B.*, 148 S.W.3d 919, 927 (Tenn. Ct. App. 2004), in which this Court reversed the trial court's finding that the father's failure to pay child support had been willful in part because "the permanency plans not only failed to state that Father was obligated to pay child support, they, in fact, implied that he was not required to do so unless there was a court order of support." We determine the instant case to be factually distinguishable from *In re J.J.C.*, in which the father had consistently provided

items for his children while they were in protective custody and had contacted DCS personnel several times without being informed by DCS personnel of the requirement to pay support. *See id.*

In contrast, Father in this case sent nothing to the Children while they were in protective custody. He was specifically directed to contact Child Support Enforcement and was unable to present any proof that he did so. Ms. Steadman's testimony revealed that she and Father reviewed the requirement that he support his Children "word for word," and the Grandparents acknowledged that they were informed of Father's support requirement during the August 19, 2009 child and family team meeting, in which they also participated telephonically. Moreover, "the obligation to pay support exists even in the absence of a court order to do so." *State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004); *see, e.g., In re Emily N.I.*, No. E2011-01439-COA-R3-PT, 2012 WL 1940810 at *13 (Tenn. Ct. App. May 30, 2012) (concluding that the father's reliance "on the fact that he was not specifically ordered by the court to remit child support" until a month prior to filing of the petition for termination was erroneous in light of his presumed knowledge of the obligation). Father's reliance on *In re J.J.C.* is misplaced.

Father also posits that his failure to pay child support was not willful because he did not have the ability to earn income due to poor physical health and a six-month term in a drug rehabilitation facility during the two years preceding the trial. *See In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008) ("'A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child.'") (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302 at *8 n.17 (Tenn. Ct. App. Apr. 14, 2005)). According to the Grandparents' testimony, Father weighed approximately 410 pounds prior to his undergoing "gastric sleeve" weight loss surgery in December 2010, approximately one month before the filing of the instant petition. By the time of trial, Father's weight was down to 325 to 330 pounds. Grandfather stated that although Father previously had been employed part-time mowing lawns and performing maintenance chores at the Grandparents' mobile home park, by the time Father was at his heaviest weight, he could not fit behind the steering wheel of the riding lawn mower and was physically unable to complete the work. Grandmother added that Father suffered from painful bouts of gout that necessitated him engaging friends to stay with him and assist with his personal care. She indicated that she and Grandfather paid many of Father's expenses.

Despite Father's difficulties with weight and other health problems, the trial court found that Father was able-bodied and capable of working. Ms. Steadman testified that in her telephone calls with Father in 2009, he indicated that he was employed performing maintenance at the Grandparents' mobile home park and gave no indication that he was physically unable to work. Father's reason for failing to appear at the trial, per his counsel,

was that he could not miss college classes. The Grandparents' testimony indicated that these classes were actually online but that Father physically traveled to the college's administrative offices approximately every other week. Grandfather acknowledged that Father had applied for disability but had been denied. The record does not indicate that Father was wholly incapable of employment during the relevant four-month period.

Regarding Father's enrollment in a drug rehabilitation program, the Texas ICPC report demonstrated that Father was arrested on June 14, 2006, for possession of a controlled substance and that the charge was deferred with five years of probation. According to Grandfather, it was the 2006 "drug bust" that prompted the Grandparents to bring the Children and their youngest sibling, five weeks old at the time, into the Grandparents' home. Grandfather stated that the Texas criminal court assigned Father to a minimum-security facility for first-time offenders with substance abuse problems and that Father completed a six-month program there. Father presented no evidence of the completion date of his rehabilitation program. According to the time line indicated by the Grandparents' testimony, Father completed rehabilitation before he enrolled in an online program to become certified as a chemical dependency counselor, all of which occurred before Father underwent gastric sleeve surgery in December 2010. Grandmother stated that Father missed an October 7, 2010 court date because he was having gallbladder pain and gave no indication that Father was unable to appear due to his rehabilitation program. The record does not support Father's assertion that his time confined to a rehabilitation program precluded his ability to be employed during the determinative four months preceding the filing of the instant petition.

We conclude that the evidence does not preponderate against the trial court's determination by clear and convincing evidence that Father abandoned the Children by willfully failing to support them during the more than three years they were in protective custody, including the four months preceding the filing of the termination petition. The trial court did not err in terminating Father's parental rights based upon this ground.

## VI. Best Interest of Children

When a parent has been found to be unfit by establishment of a statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (2010) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Further, the best interest of a child must be determined from the child's

-13-

perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances[5] as may render the parent or guardian

_____

[5]Effective July 2012, after the filing of the petition in the instant case, The Tennessee General Assembly amended Tennessee Code Annotated § 36-1-113(i)(7) to substitute "alcohol, controlled substances or controlled substance analogues" in place of "alcohol and controlled substances." *See* 2012 Pub. Acts ch. 848, § 8.

consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In determining that termination of Father's parental rights was in the best interest of the Children, the trial court stated:

The Court finds that [Father] has not made changes in his conduct or circumstances that make it safe for the child to go home with him, because he has criminal charges related to sexually abusing the child Michaela [V.] pending in Texas, and he does not have a stable source of income, has not supported the children.

[Father] has not made lasting changes in his lifestyle or conduct that would make it safe for the child[ren] to return to his home after reasonable efforts by the state to help, so that lasting change does not appear possible because [Father's] lifestyle has not changed one bit since the children came into custody in 2008.

[Father] has not paid child support.

[Father] has shown little or no interest in the welfare of the children.

There is no meaningful relationship between the children and [Father].

The children do not want to return to [Father's] home and want to be adopted, instead.

[Father] is not a viable placement option for the children because of his pending sexual abuse charges, there is a standing no contact order with the children, and he failed the home study for placement of the children in his home.

(Paragraph numbering omitted.) The trial court therefore concluded that it was in the Children's best interest to terminate Father's parental rights. We agree.

Father has not raised on appeal the issue of whether termination of his parental rights was in the Children's best interest, and Father offers no argument against the trial court's

-15-

finding in this regard. The State properly has raised the issue because having found a ground for termination of parental rights, a trial court is required to consider, as we must on review, whether termination of those rights is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(i); *In re Audrey S.*, 182 S.W.3d at 877. The trial court in its Final Decree considered the factors enumerated in Tennessee Code Annotated § 36-1-113(i) and specifically found that all relevant factors weighed against maintaining Father's parental rights. In addition, the court noted the following regarding Father's failure to appear at trial:

> [Father] was not present and counsel related to the Court that he was in college in Texas and could not miss class. The Court recited that [Father] was not present at the last hearing which was continued on his behalf, and a subpoena was issued for his appearance today, and therefore he is voluntarily absent from these proceedings.

The record demonstrates that throughout the three years the Children were in protective custody, Father participated in one child and family team meeting telephonically but otherwise failed to participate in any DCS meetings or court proceedings. The no-contact order entered by the Juvenile Court against Father prevented him from directly contacting the Children, but Father also showed little involvement with or meaningful connection to the Children through his failure to accomplish any steps in the permanency plan created in August 2009 and his complete failure to provide financial support during the relevant time period. DCS case manager Kim Steadman testified that she had difficulty reaching Father in Texas after the Children were taken into protective custody in August 2008. She spoke to Grandmother several times before Father eventually contacted her on July 13, 2009, nearly a year after the initial removal from Mother's home.

At the close of trial, the court expressed concern from the bench regarding the effect that terminating Father's parental rights would have on the Children's relationship with the Grandparents. The Grandparents' testimony emphasized that Father lived approximately a quarter-mile and "up on a hill" from Grandparents' home and that they were willing to keep the Children separate from Father if ordered to do so by the court. Their testimony also demonstrated, however, that the Grandparents refused to consider it possible that allegations of Father's sexual abuse of Michaela could be true, that they supported and cared for Father's needs, and that they allowed the sibling in their custody to maintain a relationship with Father. The evidence does not preponderate against the trial court's finding that it would not be safe to return the Children to Father's home or to the Grandparents' home.

We note also that testimony from Mr. Sherfey and a therapeutic counselor working with all three Children, Kathryn Leonard, indicated that despite some initial behavior problems that necessitated placement in separate foster homes, the Children were flourishing

by the time of trial. Clearly DCS was committed to a goal of reuniting the Children in one adoptive home. From a thorough examination of the record before us, we determine that there is clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

## VII. Conclusion

The judgment of the trial court terminating the parental rights of Father is affirmed. Costs on appeal are taxed to the appellant, Michael V., Sr.. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE